FILED

99 MAY 12 AM 9:24

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
MAY 12 1999

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HARTFORD UNDERWRITERS INSURANCE COMPANY, et al., ) ) ) Plaintiffs, ) ) v. ) ) WORKFORCE OF BIRMINGHAM, INC., et al., ) ) ) Defendants. ) | CIVIL ACTION NO. CV-95-PT-3185-S |

## MEMORANDUM OPINION

I       History of the Action

This cause comes to be heard on plaintiffs' Motion for Reconsideration Requesting this Court to reconsider its prior Order and Opinion involving plaintiff's Summary Judgment Motion filed against defendants Workforce of Birmingham, Inc., W&W Limited Workforce of Memphis, Inc., Workforce General, Inc., PermaTemps of Alabama, Inc, d/b/a Workforce, and Darrell H. Walker filed on April 30, 1998. The court originally found, in reaching its decision regarding plaintiffs' Summary Judgment Motion, that the corporate defendants, Workforce of Birmingham, Inc., W&W Limited Workforce of Memphis, Inc., Workforce General, Inc., and PermaTemps of Alabama, Inc. d/b/a Workforce, were liable to plaintiffs for some amount of unpaid premiums that the court could, at that time, not determine as a matter of law. The court summarized and analyzed the issues surrounding the Summary Judgment Motion as follows.

In December of 1995, Hartford Underwriters filed a complaint against Workforce of Birmingham, Inc. ("Workforce"), an Alabama corporation doing business as a temporary agency. Hartford sought to recover insurance premiums left unpaid by Workforce following the expiration of a policy that covered

February of 1992 through February of 1993. The action originally appeared as a common collection action based on breach of contract, unjust enrichment and open account and sought only to recover the difference between premiums calculated on audit and the premiums actually paid by Workforce of Birmingham. Since that time, Hartford has added Liberty Mutual and Aetna as plaintiffs, added ten additional defendants, stipulated to dismissal of six of those defendants (leaving one individual, Darrell Walker, and four corporations), and added claims for account stated, violation of the federal RICO statute, claims for fraudulent misrepresentation and suppression, conspiracy to defraud, negligence, and breach of fiduciary duty. Plaintiffs now seek summary judgment on counts of misrepresentation, suppression, breach of contract, negligence and breach of fiduciary duty.

II     Factual Background and Summary of Plaintiffs' Claims

Darrell Walker ("Mr. Walker") began operating incorporated temporary agencies in the early 1980's. He initially opened offices in Montgomery, Alabama and Birmingham, Alabama, providing temporary employees to businesses on a short term basis. He continued to expand his involvement in temporary agencies during the remainder of the 1980's and the early 1990's, eventually becoming involved, to some extent, in the ownership and/or control of a number of temporary agencies, including offices in Huntsville (AL), Memphis (TN), Nashville (TN), Jackson (MS), Goodletsville (TN), and Eufala (AL). The precise extent to which Mr. Walker owned and controlled these businesses is a major issue in this case.

One of the major expenses associated in the operation of temporary agencies was and continues to be the premiums paid to provide for workers' compensation insurance. Temporary agencies in Alabama and Tennessee are responsible for providing workers' compensation insurance not only for their permanent office and operations personnel, but for the temporary employees they send to other businesses. This case arises out of disputes surrounding workers' compensation insurance policies written by plaintiffs Hartford, Aetna and Liberty Mutual under the Alabama and Tennessee assigned risk plans for businesses owned or

operated by Mr. Walker.

Plaintiffs seek, through actions based on breach of contract and negligence, to recover allegedly unpaid premiums. Plaintiffs allege that the premiums were left unpaid by businesses owned or controlled by Mr. Walker following audits done at the completion of policy terms. Plaintiffs also bring claims based on misrepresentation, suppression, and breach of fiduciary duty. During the early 1990's, many of the businesses associated with Mr. Walker underwent name changes and, according to insurance applications filed with the assigned risk plans of Alabama and Tennessee, changes in ownership. Plaintiffs contend that such changes were part of a scheme developed by Mr. Walker to artificially and fraudulently lower the workers' compensation insurance premiums for his businesses. Plaintiffs claim that the following businesses are responsible for the payment of both past due audited premiums and for premium amounts over and above those audited premiums as a result of "modification factors" that, if not for the fraudulent scheme allegedly implemented by Darrell Walker, would have applied to the calculation of those premiums:

> W&W Limited Workforce of Memphis, Inc., written by Liberty Mutual,
> May 1990-91, WC1-351-215550-010.
> Workforce General, Inc., written by Aetna,
> February 1991-92: 094C21311015CAA
> February 1992-93: 94(76)C22293270CAA
> February 1193-94: 076C23213314CAA
> Workforce of Birmingham, Inc., written by Hartford,
> February 1992-93: 77WZAA9412
> February 1993-94: 77WZZD6717
> PermaTemps of Alabama, Inc. d/b/a Workforce, written by Liberty Mutual,
> October 1992-93: WC1-351-258551-012


III    Background Regarding the Workers' Compensation Insurance Industry

A.    "Assigned Risk" Plans

To fully understand the claims involved in this case, one should have a basic understanding of the practices and programs of the workers' compensation insurance industry. Most states, including Alabama and Tennessee, require employers to obtain workers' compensation insurance for their employees or, with

3

proof of financial ability to pay, to self-insure the payment of workers' compensation. Ala. Code of 1975, §25-5-8  In the case of temporary agencies, the term "employees" includes those persons who are sent by the temporary agency to other businesses on a temporary basis.  Each state has a "voluntary market" for workers' compensation insurance, allowing employers to "shop" for workers' compensation insurance coverage from the various insurers writing workers' compensation insurance within the employer's state. If the employer meets the underwriting criteria established by a given insurance carrier and pays the appropriate premium, the employer may freely choose to use any insurer willing to write the insurance. Many employers, however, are unable to obtain workers' compensation insurance in the voluntary market. To fill the gap that would otherwise exist in workers' compensation insurance, states have implemented plans to provide workers' compensation insurance to those employers who cannot obtain insurance through the voluntary market.  Alabama and Tennessee use "assigned risk" insurance plans to provide coverage to those employers unable to procure insurance through the voluntary market.  Both Alabama and Tennessee require each insurer that is authorized to sell workers' compensation insurance in their respective voluntary markets to also participate in the assigned risk market as established by the state plan.

  Because of the volatility of workers' compensation claims and the insurers' inability to accurately predict the frequency and dollar amounts of claims, the assigned risk plans in Alabama and Tennessee incorporate a loss-spreading mechanism, known as the National Workers Compensation Reinsurance Pool (the "National Pool"), with which plan carriers may choose to contract. The National Council on Compensation Insurance, Inc. ("NCCI") is a statistical, rate-making and research organization that administers the National Pool. The National Pool operates by using certain insurance carriers as "servicing carriers" who are designated to accept assignments of risks from NCCI on behalf of all workers' compensation insurers participating in the National Pool and doing business in a given state.

  The Alabama Workers Compensation Insurance Plan ("Alabama Plan") is the assigned risk plan for the State of Alabama. Under the Alabama Plan, Hartford, Liberty Mutual, and Aetna were designated

4

as servicing carriers for the period of time at issue in this lawsuit. When an employer in Alabama is unable to obtain workers' compensation coverage through the voluntary market, that employer may apply for coverage under the Alabama Plan with a written application. The information provided in the application is relied upon in determining the appropriate deposit premium and includes such information as the employer's name, place of business, whether the employer's name has changed in the past three years, whether the employer has previously obtained coverage in Alabama, a description of the nature of the employer's business and operations, the total number of employees working for the employer, the applicable classification codes, and the total payroll of the employer. In completing the application, the employer is required to certify that the statements made therein are true, that the employer will keep and make available a complete record of payroll transactions that might be required, and that the employer has had no difficulties with any agent or company regarding payroll records, the amount of premium charged, or the payment of premiums. Based on the applications, NCCI determines the employer's eligibility and, if the employer is eligible, designates a servicing carrier who then treats the employer as it would a customer acquired through the voluntary market. The Tennessee Workers Compensation Insurance Plan ("Tennessee Plan") operates in the same manner as the Alabama Plan in all material respects. Liberty Mutual and Aetna were designated as servicing carriers for the Tennessee Plan during the time period at issue in this lawsuit.

### B. Experience Modifiers

Workers' compensation policy premiums are based on the risk exposure taken on by a given insurance carrier. The nature and scope of the employer's business are essential factors in classifying and properly rating the employer's policy. If the operations of a given business are not accurately represented on the employer's application, the proper descriptive classification/s and their respective rates cannot be accurately determined. Thus, if an application is completed inaccurately, an employer will often pay more

5

or less than he/she actually owes. The true scope of an employer's operations, primarily meaning the amount of payroll and the number and location of worksites, is essential to the accurate calculation of premiums because the statistical likelihood of injury increases with the number of employees and overall exposure of the employer.

The employer's individual loss experience is important because, once that employer becomes eligible to participate in a given state's plan, he becomes subject to the Experience Rating Plan in that state. Under this program, the employer's past claims experiences are used to determine an "experience modification factor", or "mod," that customizes the general rating system for the specific employer in accordance to that employer's loss experiences over the previous three years. Depending on the relationship of the employer's claims experience to the average employer's claim experience, the specific employer may pay either higher or lower premiums. Hence, the information provided by an employer on his application to a state plan is extremely significant in determining the premiums that will apply to that individual employer.

## IV    Plaintiffs' Claims

### A.    Generally

According to plaintiffs, as Darrell Walker's temporary businesses became larger and more numerous, his claims experience growth and the nature of the business caused Mr. Walker's premiums for workers' compensation insurance to increase. In response to the increased costs associated with the premiums, Mr. Walker allegedly devised a method by which to fraudulently lower his workers' compensation premiums. Under the assigned risk pool plans of Alabama and Tennessee that Mr. Walker's businesses were participating in, new corporations with no ownership or control relationship with other entities, and therefore no claims or loss experience, did not have experience modifiers applied to their premiums. Operators of new and unaffiliated businesses thus avoided payment of higher premiums as a

result of experience modifiers. Plaintiffs allege that Mr. Walker, understanding this feature of the assigned risk plans, attempted to take advantage of the risk assignment plan by changing the names of his various existing entities, obtaining new tax identification numbers for those entities, altering the ownership structure of those entities, and then submitting applications for coverage in the name of the "new" corporations. The applications would deny any common majority ownership, control or connection with Mr. Walker or the other entities and would therefore allow the new corporation to obtain coverage without the added expense of the old entities' experience modifiers. According to Plaintiffs, the actions and representations made by Mr. Walker in connection with the supposed changes were fraudulent in that Mr. Walker never relinquished control of the operations and funds of the entities and in that the "new" corporations differed from the "old" in name alone. The new corporation would use the same office space, use the same employees, have the same clients, and would utilize the same centralized accounting functions with Mr. Walker's other entities. Plaintiffs thus contend that business operations at the temporary agency locations in Montgomery, Birmingham, Huntsville, Nashville, Goodletsville, Memphis, Jackson and Eufala were, at all times relevant to the claims, owned and/or controlled by Mr. Walker and that the changes in name and ownership amounted to nothing more than an attempt on the part of Mr. Walker to avoid higher experience modification factors through the use of false and misleading information and to avoid payment of proper outstanding premium balances.

    Plaintiffs also, primarily in their Second Amended Complaint, claim that Mr. Walker left unpaid premiums in the names of the old corporations. Mr. Walker would allegedly under-report payroll and improperly classify employee job duties on the initial application, thereby achieving a lower premium. When it came time for the plaintiffs to implement a final audit to accurately determine whether additional premiums were owed, either the corporation would simply fail to pay the audited amount or the corporation would no longer exist and a new corporation, with allegedly new owners and no relationship to the old corporation, would be in its place. Thus, claim the Plaintiffs, the corporations never paid the difference

7

between the premiums calculated on audit based on accurate payroll and proper job classifications and those originally paid based on the original applications.

**B. Establishing Darrell Walker's Ownership and/or Control of the Businesses Involved**

In bringing their claims against Mr. Walker and his businesses, plaintiffs seek to show that Mr. Walker was closely linked to a number of businesses through his ability to control their operations and through the fact that he, despite the representations made to the insurance companies, was the true owner of the businesses. In describing the relationship between the entities owned or controlled to some extent by Mr. Walker, Plaintiffs depict a group of businesses sharing a significant degree of centralization in the areas of tax records and calculations, insurance, and accounting and lacking in the basic formalities that normally distinguish a corporation. Plaintiffs attempt to show that, from the very beginning of Mr. Walker's involvement with the temporary agency business, his businesses were all closely linked, and looked to him as the ultimate source of control.

Plaintiffs rely heavily on the deposition of Abbie Fleming-Walker ("Ms. Fleming"), Darrell Walker's daughter, former employee, and a significant figure in the development of his Montgomery office during the 1980's and early 1990's, to substantiate their claims. According to Ms. Fleming's deposition testimony, the first temporary agency office opened by Darrell Walker was in Montgomery, Alabama, and was called Workforce, Inc. The opening of Workforce was quickly followed by the opening of a Birmingham office, Workforce of Birmingham, Inc. (incorporated in October of 1981). Although the two original businesses were structured as separate corporate entities, the quarterly tax returns and workers' compensation audits for both were compiled centrally by staff in the Montgomery office. As additional offices were opened, the practice of centralized tax computation and workers' compensation auditing continued for some period of time. According to Ms. Fleming, the workers' compensation insurance premiums were all handled by the Montgomery office until at least 1992. Mr. Walker, according to Ms.

8

Fleming, also kept blank checks from each of the offices (Birmingham, Nashville, Memphis, etc.) at the Montgomery location, allowing persons in Montgomery to pay insurance premiums and other expenses for the various entities from any account. Ms. Fleming's testimony indicates that the checks were not just used to pay the premiums or expenses for the specific businesses whose names were on the accounts, but for any of the businesses owned and operated by Mr. Walker.

In addition to the above testimony, Plaintiffs point to a number of other statements made by Ms. Fleming during her deposition. For instance, Ms Fleming stated in her deposition that the Birmingham and Huntsville offices, as she understood them, operated together. Ms. Fleming also confirmed that payroll for the Memphis office was done at the Birmingham location for at least one year and that, in 1993, a new office was opened in Birmingham for the purpose of handling the accounting for other offices, including Memphis. Ms. Fleming indicated that she did not know if a contract for such services existed. Ms. Fleming also confirmed that she, for at least some period of time, did the insurance paperwork for the Memphis, Huntsville, Birmingham, and, apparently, the Nashville offices from her office in Montgomery. Finally, Ms. Fleming stated that, to the best of her knowledge, Darrell Walker controlled each of the offices listed above.

In further support of their claims, Plaintiffs provide a 1993 agreement with the Internal Revenue Service entered into by Darrell Walker for payroll tax purposes in which Mr. Walker admits that he is the sole shareholder and alter ego of the following corporations: Workforce of Birmingham, Inc., Hands, Inc., Workforce, Inc., Workforce of Tennessee, Inc., Workforce Employee/MGM Leasing, Inc., W&W Limited Workforce of Memphis, Inc., W&W Limited, Inc., Darrel Walker Business & Employee Management CO, Inc., and PermaTemps, Inc. Additionally, Plaintiffs provide a letter from Brad Matthews (Darrell Walker's accountant hereinafter "Mr. Matthews") to Lewis Hickman (who previously acted as Darrell Walker's attorney in this case) verifying that Darrell Walker and/or entities owned by Darrell Walker owned W&W Limited Workforce of Memphis, Workforce of Birmingham, Inc., PermaTemps of Alabama, Inc., and

9

PermaTemps. Plaintiffs, to further exemplify the admitted integration between these entities, also submitted a letter dated June 14, 1994 on Workforce letterhead indicating that Workforce had offices in Birmingham, Roebuck, Huntsville, Jackson (MS), Goodletsville (TN), Southhaven (MS), Memphis, and Blythesville (AK). By this point, the Montgomery office was owned by Darrell Walker's ex-wife as the result of a divorce settlement.

Plaintiffs also submit accounting records for the Huntsville office indicating that money in the bank accounts of the Workforce offices in Birmingham, Nashville, Jackson, Montgomery and Huntsville were commingled, resulting in numerous advances and loans being made between the entities. According to plaintiffs, these funds were commingled because, in essence, they were being transferred between closely related businesses that actually functioned as a financial whole. In his deposition, Mr. Matthews stated that he has been unsuccessful, despite having made attempts, in finding any evidence that the transactions were ever put into the form of promissory notes or the like. Memos and letters written by Mr. Matthews also indicate commingling and transfers of funds between entities such as PermaTemps of Alabama, Inc. (Huntsville), Workforce of Birmingham, Inc., and PermaTemps, Inc. Further, as far as Mr. Matthews understood, there existed no board minutes or other appropriate documentation of the various loans, advances, commissions or management fees paid or transferred among the entities he thought were controlled by Mr. Walker. Mr. Matthews further stated, both at deposition and in a memo to Mr. Walker, that he believes, judging from the payees of canceled checks, that Mr. Walker was taking money out of Darrell Walker Management, Inc. bank accounts to cover personal expenses. Darrell Walker Management, Inc. is the name of a corporation Mr. Walker used as a holding company for several other entities operating as temporary agencies. Mr. Matthews' memo goes on to instruct Mr. Walker to set up a personal checking account to cover his own expenses and to give himself a salary from his businesses rather than taking directly from corporate accounts.

C. **The Applications and Misrepresentations**

On May 9, 1990, W&W Limited Workforce of Memphis, Inc. ("W&W"), a business Mr. Walker owned 51% of, submitted an application for assigned risk workers' compensation insurance for the State of Tennessee. The application stated that W&W was a new business that had not experienced any name changes, mergers or consolidations in the previous three years. The application further stated that W&W had no operations outside of Tennessee. The risk was assigned to Liberty Mutual, coverage was bound, and, relying on the information provide in the application to calculate risk coverage and premiums due, Liberty Mutual issued a policy.

Despite the statements made on the application regarding operations outside of Tennessee, W&W's franchise and excise tax returns provided by the plaintiff for the years of 1992, 1993 and 1994 state that the operations of W&W were reported in a consolidated report with Mr. Walker's other entities. These records also reflect that the books and records of W&W were maintained in Birmingham at the same address as Workforce of Birmingham. Plaintiff also provides a letter from Brad Matthews to the IRS confirming that W&W filed as part of a consolidated group in 1991 and 1992 and that Darrell Walker "exerts control of other companies not listed on Form 851 (because they were not part of the consolidated group) as follows: Hands, Inc., Workforce of Jackson, Inc., Permatemps of Alabama, Inc. and Workforce of Birmingham, Inc."

Workforce General, Inc. (of Montgomery), submitted an application for assigned risk workers' compensation on February 5, 1991 for the State of Alabama. The application stated that Workforce General was a new business with no name change, merger or consolidation within the previous three years. Abbie Fleming and Wesley Walker, Darrell Walker's nephew, were listed as owners and officers of the corporation. The risk was assigned to Aetna, coverage was bound, and, relying on the information provide in the application to calculate risk coverage and premiums due, Aetna issued several policies. According to Ms. Fleming's deposition testimony, Workforce General's business address was the same as that of

Workforce, Inc., the first temporary agency opened by Mr. Walker in the early 1980's, and the same as that of BTS, Inc., a company formed in the place of the original Workforce, Inc. The changes made to the business's name and the shifting of its nominal ownership structure were, according to Ms. Fleming, for the purpose of lowering the business's experience modifier and thus lowering insurance premiums. The clients, employees, and true control of the business all remained the same. Ms. Fleming's testimony states that Richard ("Dick") Harruff, of Palomar Insurance, told Mr. Walker that the name change and restructuring of ownership would provide a means by which to pay lower premiums for workers' compensation insurance through the elimination of high modification factors.

According to Plaintiffs, Ms. Fleming's testimony, along with that of Wesley Walker, makes it clear that, despite the name changes and purported alterations in ownership, Darrell Walker remained in complete control of the business. Ms. Fleming states unequivocally that Mr. Walker retained complete control over the business following the purported changes. Additionally, when shown documents indicating that he was a shareholder and officer of Workforce General, Inc., Wesley Walker stated that he had never even heard of the company before and that he certainly had no ownership interest therein.

On February 27, 1992, Workforce of Birmingham, Inc. submitted an application for assigned risk workers' compensation insurance for the State of Alabama. The application indicated that the business was a new entity being formed with Linda Channell (Darrell Walker's daughter), Mavis A. Walker (his former wife), and A.J. Walker (Abbie Fleming) as officers and owners. Hartford was assigned the risk for this business and issued a policy in reliance on the information provided. Despite the information provided in the application, the tax returns for the business identify Darrell Walker as the sole shareholder of the corporation. Plaintiffs also provide letters from Mr. Matthews to the IRS and from Mr Matthews to Lewis Hickman indicating that Mr. Walker exerted control over Workforce of Birmingham, Inc. The agreement made between Mr. Walker and the IRS also indicates that Darrell Walker owns Workforce of Birmingham, Inc.

On October 22, 1992, PermaTemps of Alabama, Inc. d/b/a Workforce submitted an application for assigned risk workers' compensation insurance for the State of Alabama indicating that Wesley Walker owned 51% of the business, Darrell Walker owned 48%, and that both men acted as officers. The application further stated that the business had operated for two years, had not undergone a name change in the previous four years, and had not been previously related through common majority ownership to any other entities in the previous four years. As with the other entities, the tax returns and letters from Mr. Walker's accountant indicate that Darrell Walker is the sole shareholder and controlling force behind the business. Ms. Fleming's deposition reveals that Wesley Walker had no part in the operations of the business and, in fact, was indicated on the application as having a controlling interest because, "That's the way we had been taught that it had to be done." Further, Wesley Walker stated, during his deposition, that he had never even heard of PermaTemps of Alabama, Inc. and that he had never owned any interest in the company, had never acted as an officer thereof, and had never given anyone permission to use his name in that capacity.

Plaintiffs use Wesley Walker's deposition testimony concerning a Eufala, Alabama office opened by Mr. Walker to further establish the fact that Mr. Walker regularly and routinely created corporations with nominal shareholders who actually had little or no connection to the corporation. When asked about the Eufala business, Wesley Walker stated that Darrell Walker had requested Wesley to allow him to put a new office "in his (Wesley's) name." Wesley agreed and signed papers indicating that he was the owner of the Eufala business. However, Wesley stated that he never had anything to do with the operation or true ownership of the Eufala business, and that it was Darrell Walker who actually owned and operated the office. Wesley's only benefit that came as a result of his 'ownership" of the business was the use of the business's payroll records system for Wesley's other businesses. Wesley indicated that he neither received nor did he pay for any stock, that he never received any dividends, and that he had nothing to do with the ownership and operation of the business, despite being the record owner and president of the business.

D. **Plaintiffs' Damage Claims**

Plaintiffs have submitted an Affidavit and Supplemental Affidavit given by Mr. Jeffrey W. Tipton, a Senior Business Analyst with the Special Investigations Unit of Liberty Mutual Insurance Company. Mr. Tipton has a substantial amount of education and experience in the financial accounting field and, according to his affidavit, has reviewed thousands of documents regarding the accounting practices of Darrell Walker and his businesses as well as accounting information supplied by the plaintiff insurance companies regarding the policies at issue in this case. Based on the information supplied by Mr. Walker's accountant and the insurance companies, Mr. Tipton claims to have calculated the amounts owed to the Plaintiffs for both unmodified past-due premiums and for the additional premiums that Defendants owe if the correct modification factors are used. Plaintiffs, relying on Mr. Tipton's analysis and calculations, seek judgment against Defendants in the following amounts:

        Amounts due prior to applying modification factor:
           Workforce of Birmingham, Inc. – $188,476
           W&W Limited Workforce of Memphis, Inc. – $641,001
           PermaTemps of Alabama, Inc. – $16,544
           Workforce General, Inc. – $147,610
              TOTAL     $845,670
           and Darrell Walker, jointly and
           severally, in the amount of $845,670.

        Amounts due following application of correct modification factor:
           Workforce of Birmingham, Inc. – $321,064
           W&W Limited Workforce of Memphis, Inc. – $929,842
           PermaTemps of Alabama, Inc. – $26,308
           Workforce General, Inc. – $366,631
              TOTAL     $1,598,878
           and Darrell Walker, jointly and
           severally, in the amount of $1,598,878.

V    **Defendant's Response**

Mr. Walker, who is proceeding without counsel in this action, has responded to Plaintiffs' Motion for Summary Judgment by filing a motion to strike the deposition of Ms. Fleming based on the grounds that

she was not competent to testify about matters involved with the case. Mr. Walker relies on an affidavit provided by Ms. Fleming stating that her memory of the years between 1989 and 1994 is poor due to psychiatric and drug problems and that Mr. Badham, one of Plaintiffs' attorneys, took advantage of her weakened state of mind. She goes on to claim that she often guessed during the deposition in order to tell Mr. Badham what he wanted to hear and that Mr. Badham had used repetitive leading language to coax his desired answers out of her.

Mr. Walker has also filed a "Motion to [Rescind] Plaintiffs' Motion for Leave to Amend Complaint Filed July 31, 1996." The motion is based on the claim that Mr. Walker had, in April of 1996, paid an attorney to file a Chapter 7 Bankruptcy Petition for Workforce of Birmingham, Inc. and that the additional parties added by plaintiff as a result of the amended complaint were added only to thwart "the legal avenue of Workforce of Birmingham, Inc. to pursue relief through the bankruptcy courts." Plaintiff describes the joining and subsequent dismissal of additional defendants by the Plaintiffs as "reckless persecutions" and calls for the court to [rescind] the Plaintiffs'' 1996 motion to amend their complaint.

Finally, Mr. Walker has filed a response to the Plaintiffs'' motion for summary judgment in the form of a Motion for the Court to Reject Plaintiffs' Motion for Summary Judgment. In responding, Mr. Walker claims that Plaintiffs have failed to meet the requirements for summary judgment through failing to give specifics relating to the offices in Montgomery, Eufala, Jackson, Goodletsville, Memphis and Huntsville. Mr. Walker states that, "Contrary to the truth, the Plaintiffs alleged that these offices were all owned and controlled by Darrell Walker, while at the same time dismissing all persons who had given depositions contrary to their claims." Mr. Walker's Response goes on to state that former defendants in this action had admitted to having ownership interests in some of the entities named above and that Plaintiffs knew of such admissions. Additionally, Mr. Walker alleges that the Plaintiffs made claims regarding the locations of offices that Plaintiffs knew to be false.

According to Mr. Walker, Plaintiffs' own exhibits show that there was not a plot on his part to

deceive the Plaintiffs. In attempting to support this claim, Mr. Walker points to an exhibit that "clearly shows Darrell Walker as having 20 years in the business." Mr. Walker also claims that "The Plaintiffs have in their possession and in fact used for their evidence, depositions that clearly show that Darrell Walker did not control the activities of the entities [in] which he did in fact have an interest." Mr. Walker, to evidence his claim, points to an affidavit provided by Robert McReynolds of Workforce of Jackson, Ms., in which Mr. McReynolds acknowledges that Mr. Walker is the majority shareholder of the business, but that he had spent very little time (about 48 hours total) in Jackson during the entire existence of the business. Mr. Walker goes on to decry the fact that Plaintiffs failed to make any reference to the fact that he "openly acknowledged, with pride, that he did in fact own several of the corporations named in this complaint but not all."

Mr. Walker claims, in his response, that, "Despite overwhelming evidence and testimony that tax problems and EEOC problems [were] in fact the only reason for [him] to form new corporations and to close some offices," Plaintiffs continue to wrongly assert that the only motivation behind the changes was the goal of avoiding higher experience modifiers. Mr. Walker further states that Plaintiffs have failed to offer the fact that several of his businesses have, in the past, paid premiums subject to high modification factors. Mr. Walker also asserts that the Motion for Leave to Amend Complaint filed on July 31, 1996 by the Plaintiffs was invented "as a means of avoiding the full impact of [the Workforce] bankruptcy proceeding and was . . . used as a vehicle for discovery against Darrell Walker." To buttress his claim, he points to the fact that all other defendants have been dismissed. Mr. Walker describes the Plaintiffs' actions as a means by which to inappropriately use the RICO statute to accomplish discovery. Attached to the Response is a copied page from a portion of a book covering Civil RICO Abuse, generally discussing the role of Rule 9(b) motions and their role in prohibiting a plaintiff from engaging in discovery to discover a fraud.

Mr. Walker also alleges that Plaintiffs have failed to indicate clearly what the modification factor

was when the new corporations were formed as opposed to what they claim it should have been. Mr. Walker states that Plaintiffs have, therefore, failed to comply with the judge's instructions and that summary judgment should not be granted. Mr. Walker acknowledges that some of his businesses have, at times, paid higher modification factors than start-up businesses, but claims, in his response, never to have taken any action regarding that area of his businesses. Mr. Walker's response also claims that Charles Elam, an agent with the IRS, was one of those who suggested that Mr. Walker "close or let die certain corporations so that we could get a fresh start and stay current as the penalties and interest of some of the existing companies were becoming so excessive[ly] impossible to clear up." Finally, Mr. Walker claims that Mr. Tipton's affidavit is based on facts Mr. Tipton knows are false and calls for the striking of the affidavit.

Also attached to the documents filed by Mr. Walker are: (1) an affidavit given by his sister, Linda Channell, attesting to the fact that Mr. Walker has no ownership interest in All Around Temps, Inc. and AllTemps Systems, Inc., businesses not referred to in Plaintiffs' motion; (2) an affidavit of Brad Matthews, submitted by Mr. Walker, stating that Mr Matthews never spoke to Mr. Tipton, but that Mr. Tipton did come into Mr. Matthews office to examine accounting records; (3) an affidavit of Darrell Walker himself stating that businesses in Nashville, Goodletsville, Huntsville and Birmingham were closed by him in order to better prepare to defend against an EEOC class action suit against Mr. Walker and his businesses (the action was later dismissed); and (4) an affidavit of Lewis Hickman (formerly Mr. Walker's attorney) confirming that he advised Mr. Walker that it might be in his best interests to close some offices to better defend against the EEOC action. Mr. Hickman goes on to state that Linda Channell went on to form her own companies using Mr. Walker's "business training, techniques,, and contacts to salvage their customer base."

17

VI      **Plaintiffs' Response to Defendants' Motions and Assertions**

Plaintiffs, in responding to the statements in Mr. Walker's Response, cite the language within the Court's Order dated May 1, 1998, stating "[w]hen a motion for summary judgment is supported by affidavits or other documents, the party opposing the motion may not depend upon the mere allegations and its pleadings to counter the motion. . .. The party opposing the motion must respond with counter-affidavits or documents to set forth specific facts showing that there is a genuine issue of material fact to be litigated at trial." Plaintiffs contend that Mr. Walker has failed to meet this requirement.

Plaintiffs first point out that Mr. Matthews affidavit does not, in any way, refute the affidavit testimony of Mr. Tipton and, in fact, confirms that Mr. Tipton did go to his office to examine accounting records. Plaintiffs add that the affidavits of Mr. McReynolds and Ms. Channell fail to "contradict or controvert the facts set forth in Plaintiffs' summary judgment motion." In regard to the affidavit of Ms. Fleming, the Plaintiffs deny any impropriety in the taking of the deposition and state that, "even if taken at face value, [the affidavit] does not contradict nor change the pertinent portions of her deposition that are relied upon by the Plaintiffs. . ." Similarly, Plaintiffs state that the claims surrounding the EEOC charges and lawsuit as made by Mr. Walker and Mr. Hickman are, again, unrelated to the assertions set forth in the motion for summary judgment.

VII     **Court's Conclusions**

Based upon the above examination and analysis of the case and on plaintiff's Motion for Reconsideration, this court now concludes that the corporate defendants are liable to the plaintiffs, jointly and severally in the amount of $1,598,878.00. The court has been informed that the plaintiffs and Walker have reached a settlement. Walker has therefore, pursuant to that settlement agreement, been dismissed as an individual defendant. Pursuant to the Summary Judgment Motion, the Motion for Reconsideration, and the settlement agreement reached by the parties, court will enter an Order and judgment in favor of the

plaintiffs against the corporate defendants jointly and severally in the amount of $1,598,878.00.

This **10th** day of May, 1999.

                                                    ROBERT B. PROPST
                                         UNITED STATES DISTRICT JUDGE